# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GERALD H. HAWKINS, *et al.*,

    Plaintiffs,

    v.

DAVID L. BERNHARDT, *Secretary, U.S. Department of the Interior, et al.*,

    Defendants.

Civil Action No. 19-1498 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

Plaintiffs, a group of landowners in the Upper Klamath Basin in Oregon, seek declaratory and injunctive relief against defendants, officials in the Bureau of Indian Affairs ("BIA") and the Department of the Interior, to prevent enforcement of the Klamath Tribes' reserved water rights.[1] In particular, plaintiffs challenge two protocol agreements executed by the Klamath Tribes and the BIA, setting forth procedures for the enforcement of the tribes' water rights, arguing that in signing the agreements, the BIA unlawfully delegated federal power to the tribes and, additionally, violated the National Environmental Policy Act ("NEPA"). *See* Am. Compl. ¶¶ 41–53; Pl.'s Opp'n to Mot. to Dismiss ("Pl.'s Opp'n") at 1, ECF No. 19. Defendants move pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss the plaintiffs' amended complaint for lack of subject matter jurisdiction and for failure to state a claim. *See* Defs.' Mot. to Dismiss and Mem. Pts. and Auth. in Support ("Defs.' Mot."), ECF No. 17. The

---

[1] The four named defendants are David L. Bernhardt, Secretary of the Interior; Tara Katuk MacLean Sweeney, Assistant Secretary-Indian Affairs; Darryl Lacounte, Director, U.S. Bureau of Indian Affairs; and Bryan Mercier, Regional Director, U.S. Bureau of Indian Affairs, Northwest Regional Office, each of whom are sued in their official capacities. Am. Compl. ¶¶ 1, 9–13, ECF No. 15.

defendants are correct that the plaintiffs lack standing, and thus the amended complaint is dismissed under Rule 12(b)(1).[2]

## I.    BACKGROUND

The gravamen of this case is the repercussions to the plaintiffs of enforcement of tribal water rights.  To provide context for resolution of the pending motion, the applicable treaty, laws and challenged protocol agreements are described below, followed by a summary of the plaintiffs' claims.

### A.    Overview of Legal Regime Governing Relationship Between United States and Klamath Tribes

For more than a thousand years, the Klamath Tribes "hunted, fished, and foraged in the area of the Klamath Marsh and upper Williamson River," in southern Oregon.  *United States v. Adair*, 723 F.2d 1394, 1397 (9th Cir. 1983).[3]  In 1864, the Tribes ceded approximately 12 million acres of land to the United States by treaty, and, in exchange, the United States reserved roughly 800,000 acres for the Tribes.  *Id*. at 1398; Treaty with the Klamath ("Klamath Treaty"), 16 Stat. 707 (1864).  Article I of the Klamath Treaty granted the tribes "the exclusive right to hunt, fish, and gather on their reservation."  *Adair*, 723 F.2d at 1398; 16 Stat. 708.  Article II created a [trust fund] designed to "advance [the Tribes] in civilization … especially in agriculture."  *Id*.

In 1954, Congress terminated federal supervision of the Tribes.  *See* Klamath Termination Act, 68 Stat. 718 (1954) (codified at 25 U.S.C. § 564, now omitted).  "The express purpose of [the Klamath Termination Act] was to terminate federal supervision over the Klamath Tribe of Indians, to dispose of federally owned property acquired for the administration of Indian

---

[2]    Having reached the conclusion that dismissal is appropriate under Rule 12(b)(1), the alternative basis for dismissal, under Rule 12(b)(6), need not be addressed.  *See* Defs.' Mot. at 29–42.
[3]    The Klamath Tribes are currently a federally recognized nation consisting of three related tribes: the Klamath, Modoc, and Yahooskin.  Older caselaw concerning the Tribes' rights generally refers to the Tribes in the singular, as the "Klamath Tribe," but the federal government, the parties and the Tribes themselves use the more accurate plural "Klamath Tribes."

affairs, and to terminate the provision of federal services to the Indians solely because of their status as Indians." *Kimball v. Callahan*, 493 F.2d 564, 567 (9th Cir. 1974). The Termination Act did not, however, abrogate the Tribes' treaty rights to hunt, fish, and gather. *Id.* at 568–69; *Adair*, 723 F.2d at 1411–12. Indeed, the Termination Act states explicitly, "[n]othing in this Act shall abrogate any water rights of the tribe and its members" and "[n]othing in this Act shall abrogate any fishing rights or privileges of the tribe or the members thereof enjoyed under Federal Treaty." 68 Stat. at 722, 25 U.S.C. § 564m.

Pursuant to the Termination Act, certain tribal members elected to withdraw from the tribes in exchange for the cash value of their proportionate interest in the tribal property. *Kimball*, 493 F.2d at 567. Reservation lands were sold "to pay the withdrawn members," while a smaller portion was retained in trust under a "nongovernmental tribal management plan." *Id.*

In 1986, Congress restored the Klamath Tribes to federal recognition. *See* Klamath Indian Tribe Restoration Act, 100 Stat. 849 (1986) (codified at 25 U.S.C. § 566). The Restoration Act "restored the Tribes' federal services, as well as the government-to-government relationship between the Tribe and the United States," but "did not alter existing property rights," meaning previously sold reservation lands were not returned. *Klamath Tribe Claims Committee v. United States*, 106 Fed. Cl. 87, 90 (2012).

In 1975, the United States filed suit in Federal District Court in Oregon, seeking a declaratory judgment to determine the respective water rights of the Klamath Tribes and interested private land owners in Klamath County. *See* Am. Compl. At ¶ 15; Defs.' Mot. at 9. The Tribes intervened as a plaintiff, and Oregon intervened as a defendant. Defs.' Mot. at 9. The district court's finding that the Tribes had implied water rights "necessary to preserve their hunting and fishing rights," under the 1864 Klamath Treaty, *United States v. Adair*, 478 F. Supp.

336, 350 (D. Or. 1979), was affirmed, *Adair*, 723 F.2d at 1399 (holding that the Tribes possessed a right "to as much water on the Reservation lands as they need to protect their hunting and fishing rights"). Specifically, the Ninth Circuit concluded that the Termination Act had not abrogated Tribes' water rights, *id*. at 1411–12, which took priority over those of private landowners and allowed the tribes to "prevent other appropriators from depleting the streams and waters below a protected level in any area where the[ir] non-consumptive right applies, *id*. at 1411.

While protecting the Tribes' water rights, the Ninth Circuit did not determine the precise water levels subject to protection. *See United States v. Braren*, 338 F.3d 971, 973 (9th Cir. 2003). Adjudication over protected water levels took place between 1976 and 2013 in lengthy state-run administrative proceedings in Oregon. The United States, the Tribes, and private landowners—including many of the plaintiffs in this case—filed thousands of claims in the state's administrative proceeding, known as the Klamath Basin Adjudication. *See id*. At the close of the administrative phase of the Klamath Basin Adjudication, the Oregon Water Resources Department ("OWRD") issued findings of fact and an order of determination on March 7, 2013, which was amended on February 14, 2014. Am. Compl. ¶ 19; Defs.' Mot. at 11. OWRD's Amended and Corrected Findings of Fact and Order of Determination ("ACFFOD") provisionally determined more than 700 claims, including claims brought by the United States as trustee on behalf of the Klamath Tribes. Am. Compl. ¶ 20. These determinations quantified tribal water rights "for the Wood River and two of its tributaries, Fort Creek and Crooked Creek, the Sprague River and several of its tributaries, including Five Mile Creek, and the lower Williamson River and several of its tributaries, including Larkin Creek and Spring Creek." *Id*.

Under Oregon Revised Statute ("ORS") 539.150, parties subject to the ACFFOD may file exceptions to OWRD's determinations in Oregon state circuit court. Plaintiffs and the United States both filed exceptions, *see* Defs.' Mot. at 11, which remain pending and "are not likely to be resolved for several more years," Am. Compl. ¶ 20. Notwithstanding these appeals, determined claims under the ACFFOD are in effect, pursuant to ORS 539.130(4). *See* Am. Compl. ¶ 19. A watermaster appointed by the OWRD is tasked with enforcing such claims. *See* ORS 540.045(a)-(b). To enforce their rights under the ACFFOD, water users issue "calls" to the watermaster, who, upon investigation, regulates upstream usage to maintain necessary supply to satisfy senior downstream water rights. *See* Defs.' Mot. at 12.

**B.      Challenged Protocol Agreements Between United States and Klamath Tribes**

In 2013, following OWRD's preliminary determination, the BIA and the Klamath Tribes entered into one of the two protocol agreements challenged in this lawsuit, in order to delineate procedures for the issuance of calls enforcing the Tribes' water rights. Am. Compl. ¶ 22; Defs.' Mot., Ex. 1, Protocol Agreement Between the Klamath Tribes and the Bureau of Indian Affairs (May 30, 2013) ("2013 Protocol Agreement"), ECF No. 17-1. The 2013 Protocol Agreement established that a representative of the Tribes would, when necessary, "contact[] OWRD to make calls for enforcement of the Tribal water rights." 2013 Protocol Agreement ¶ 1. Prior to making such a call, the Tribes would notify the BIA, two business days in advance, to provide "the reasons for making such a call, including: the Tribal water right not being met, the water source and amount for the call, and an assessment based on the Tribes' information and belief that water is currently being diverted from the source at issue and that a call would provide water for the Tribal water right." *Id*. ¶ 2. Pursuant to the agreement, the BIA would then "timely provide an email response to the call notice stating either (i) agreement with making the proposed call, (ii) changes to the scope of the proposed call, (iii) disagreement with making the proposed call and

the reasons for that disagreement, or (iv) that BIA needs an additional business day to complete deliberations on the call notice." *Id.* ¶ 3.

In the event of disagreement, the 2013 Protocol Agreement established additional procedures for further discussion between the Tribal Chairman and the BIA's Regional Director. *See id.* at 4. Although this agreement authorized the United States to initiate calls on behalf of the tribes, should the Tribes not issue a call notice when necessary, *see id.* at 5, both the Tribes and the United States retained an "independent right to make a call" such that if "the Parties cannot agree on whether to make a call, either Party may independently make a call and the other will not object to the call," *id.* ¶ 7.

In 2019, the BIA and Klamath Tribes replaced the 2013 Protocol Agreement with an Amended Protocol Agreement to provide for seasonal "standing calls" and enable "OWRD to more consistently monitor, observe, and, when necessary, regulate junior water users." Defs.' Mot., Ex. 2, Protocol Agreement Between the Klamath Tribes and the Bureau of Indian Affairs (Mar. 7, 2019) ("2019 Protocol Agreement"), Preamble, ECF No. 17-2. The 2019 Protocol Agreement set forth procedures for issuing standing calls twice yearly, "one for the irrigation season (beginning on or about March 1) and one for the non-irrigation season (beginning on or about November 1)." *Id.* The Agreement also extended the time periods by which the BIA was to respond to proposed calls, to seven business days for proposed standing calls, and three business days for other calls. *See id.* ¶¶ 2–3. Again, the amended agreement retained the "independent right" of each party to make a call without the other's concurrence. *Id.* ¶ 12. In so doing, however, the agreement stipulated that the United states "retains the right not to concur with any call for water that is inconsistent with the ACFFOD or other legal obligations." *Id.*

## C.    Implementation of ACFFOD

In June 2013, following enforcement calls made by the Tribes with the concurrence of the BIA, pursuant to the Protocol Agreement, OWRD issued orders directing the plaintiffs and other landowners in the Upper Klamath Basin to cease all irrigation. Am. Compl. ¶ 25. State authorities then initiated settlement negotiations that, in April 2014, resulted in a comprehensive water settlement between the tribes and landowners called the Upper Klamath Basin Comprehensive Agreement ("UKBCA"). *Id.* ¶ 26. The UKBCA effectively lowered the water levels protected by the Tribes' rights, and established new, lower levels "designed to support fish and wildlife resources important to the Klamath Tribes while also providing irrigation opportunities for plaintiffs and other irrigators…" *Id.* ¶ 28. The Tribes and United States issued calls between 2014 and 2016 to enforce these lower, agreed-to water levels (referred to as "instream flows" and "streamflow levels") under the UKBCA. *Id.* at ¶ 29.

On December 28, 2017, the former secretary of the Interior issued a Negative Notice in the Federal Register terminating the UKBCA after Congress left the agreement unfunded. *See id.* at ¶ 31; 82 Fed. Reg. 61582 (Dec. 28, 2017). In 2017 and 2018, after the UKBCA's collapse, the Tribes and the United States issued calls seeking to enforce the tribes' water rights at the levels previously determined by the ACFFOD rather than the lower levels specified in the UKBCA. Am. Compl. ¶¶ 30–31. As in 2013, OWRD's resulting enforcement of the tribes' water rights resulted in the "severe curtailment of irrigation" and in certain cases in "complete shut-offs" for plaintiffs and other landowners in the Upper Klamath Basin. *Id.* at ¶ 31. In April 2019, the Tribes and United States again issued calls to OWRD "for enforcement of the full instream flow level water rights." *Id.* at ¶ 32.

### D.    Plaintiffs' Instant Claims

In May 2019, the plaintiffs, including over thirty individual ranchers and ranches located in the Wood River Valley in Klamath County, brought this action seeking declaratory and injunctive relief invalidating the 2019 Protocol Agreement, vacating those calls for enforcement made between 2013 and 2019, and prohibiting the defendants from issuing further calls for enforcement.  *See* Complaint., Prayer for Relief (May 22, 2019), ECF No. 1; Am. Compl., Prayer for Relief.  In August, the plaintiffs filed an Amended Complaint, *see* Am. Compl., and in September, the defendants filed the pending motion to dismiss the Amended Complaint. Following grant of an extension requested by the plaintiffs, *see* Min. Order (Sept. 17, 2019), the defendants' motion to dismiss became ripe for review on December 14, 2019.[4]

## II.    LEGAL STANDARD

 "'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'"  *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).  Under the Constitution "the 'judicial Power of the United States' is limited to 'Cases' or 'Controversies,' U.S. Const. art. III, §§ 1-2, and the requirement of standing is 'rooted in the traditional understanding of a case or controversy.'"  *Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607, 612–13 (D.C. Cir. 2019) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)).  To establish standing, a "plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[lihood]' the injury 'will be redressed by a favorable decision.'"  *Susan B. Anthony List v. Driehaus (SBA)*, 573 U.S. 149, 157–58 (2014)

---

[4]        The plaintiffs have requested a hearing, Pl.'s Opp'n at 1, n.1, but given the exhaustive briefing on the relevant issues, no hearing is necessary, *see* LCvR 7(f) (noting that "allowance" of party's request for oral hearing, "shall be within the discretion of the Court").

(quoting *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560–61 (1992)); *see also Woodhull Freedom Foundation, et al. v. United States*, No. 18-5298, 2020 WL 398625, at *6 (D.C. Cir. Jan. 24, 2020); *Carbon Sequestration Council v. E.P.A.*, 787 F.3d 1129, 1133 (D.C. Cir. 2015); *Grocery Mfrs. Ass'n v. E.P.A.*, 693 F.3d 169, 174 (D.C. Cir. 2012). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561; *see also Twin Rivers Paper Co.*, 934 F.3d at 613 (same). Absent subject-matter jurisdiction, the court must dismiss a case. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506–07 (2006); Fᴇᴅ. R. Cɪᴠ. P. 12(h)(3).

## III.  DISCUSSION

Defendants move to dismiss the plaintiff's Amended Complaint on the grounds that the plaintiffs can demonstrate neither causation nor redressability and therefore lack standing. *See* Defs.' Mot. at 1. The plaintiffs counter that the requirements of standing are met due to two procedural injuries: first, under the Protocol Agreements, the government unlawfully delegated federal power to make calls for the enforcement of federal reserved water rights to the Tribes, *see* Pl.'s Opp'n at 4; Am. Compl. ¶ 46 (First Claim for Relief); and second, that the government violated NEPA "in each of 2013 and 2017 through 2019" by failing to conduct an environmental impact study before acceding to the Tribes' calls for enforcement, Pl.'s Opp'n at 5; Am. Compl. ¶ 53 (Second Claim for Relief).

Notwithstanding the hardships alleged by the plaintiffs arising from OWRD's enforcement of the Tribes' water rights, which enforcement allegedly "resulted in widespread and severe curtailment of irrigation, and in many cases complete shut-offs," Am. Compl. ¶¶ 30, 31, 32, and concomitant "substantial injuries to their aesthetic, environmental, recreational and other interests," as well as loss of wildlife and grass plants, and a decrease in land value. *id.* ¶¶

36-37, due to nature of the tribal water rights central to this case, the plaintiffs have failed to meet the standing requirements of causation and redressability. Thus, for the reasons explained in more detail below, the defendants are correct, and the amended complaint must be dismissed.

### A. Plaintiffs Have Established Neither Causation Nor Redressability

The plaintiffs allege that the defendants' enforcement, in accordance with the Protocol Agreements, of the Klamath Tribes' water rights, suffers from the procedural defects of improper delegation of federal power and violation of NEPA. *See* Pl.'s Opp'n at 2–16. To demonstrate standing "a procedural-rights plaintiff must show not only that the defendant's acts omitted some procedural requirement, but also that it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest." *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 664–65 (D.C. Cir. 1996) (en banc); *see also National Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 5–6 (D.C. Cir. 2005).

When the alleged harm, however, stems from the government's regulation of an independent third party not before the court, rather than the plaintiff directly, standing is "'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)). In such cases, "causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well." *Id.* To prove standing in these circumstances, the plaintiff must "adduce facts showing that [third-party] choices have been or will be made in such manner as to produce causation and permit redressability of injury.'" *Ctr. For Law & Educ.*, 396 F.3d at 1161 (quoting *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2014)). In other words, the plaintiff must allege facts "sufficient to demonstrate a substantial likelihood that the third party directly injuring the plaintiff would cease doing so as a result of the relief the plaintiff sought." *Renal Physicians Ass'n v. U.S. Dep't of Health and*

*Human Servs.*, 489 F.3d 1267, 1275 (D.C. Cir. 2007); *see also Klamath Water Users Ass'n v. F.E.R.C.*, 534 F.3d 737, 739 (D.C. Cir. 2008).

Here, the plaintiffs complain about harms derived from the enforcement of the rights of an independent third party not before the Court, namely, the Klamath Tribes. In these circumstances, plaintiffs lack standing because they have demonstrated neither causation nor redressability. To understand why this is the case, the nature of the tribal water rights enforced by the tribes, the BIA, and OWRD are explained first.

### 1.     *Federally Protected Tribal Water Rights*

In *Winters v. United States*, 207 U.S. 564, 576 (1908), the Supreme Court held that a treaty establishing an Indian reservation implicitly created water rights necessary to carry out the purposes of the reservation. As the Court has since explained, "when the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation." *Cappaert v. United States*, 426 U.S. 128, 138 (1976); *see also Arizona v. California*, 373 U.S. 546, 600 (1963) ("The Court in *Winters* concluded that the Government, when it created that Indian Reservation, intended to deal fairly with the Indians by reserving for them the waters without which their lands would have been useless.").

*Winters*' recognition of water rights "rests on the idea that the reservation of public lands for a public purpose implies the reservation of unappropriated, and thus available, water appurtenant to the land to the extent necessary to fulfill that purpose." *Shoshone Bannock Tribes v. Reno*, 56 F.3d 1476, 1479 (D.C. Cir. 1995). Such rights are "federal right[s], derived from the federal reservation of the land," and thus "do[] not depend on state law." *Id.*; *see also Cappaert*,

426 U.S. at 145 (reserved water rights are "governed by federal law," and are "not dependent upon state law or state procedures."); F. Cohen, *Handbook of Federal Indian Law* ("Cohen's Handbook") 1210 (2012) ("Indian reserved rights to water are determined by federal, not state, law."). As a general rule, reserved tribal water rights persist, regardless of actual use, unless they are relinquished by treaty or explicitly abrogated by Congress. *See United States v. Dion*, 476 U.S. 734, 738–39 (1986) ("We have required that Congress' intention to abrogate Indian treaty rights be clear and plain" since "Indian treaty rights are too fundamental to be easily cast aside."); *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1155 (9th Cir. 2017) ("*Winters* rights, unlike water rights gained through prior appropriation, are not lost through non-use." (citing *Colville Confederated Tribes v. Walton*, 647 F.2d 42, 51 (9th Cir. 1981)).

The water rights of the Klamath Tribes are reserved treaty rights of exactly the nature expressly protected in *Winters*. In *Adair*, the Ninth Circuit held that the 1864 Klamath Treaty, which explicitly gave the Tribes a right to maintain their traditional hunting and fishing practices, implicitly created a water right necessary to fulfill that purpose. The Tribes' water right is "non-consumptive," meaning that the Tribes are not entitled to "withdraw water from the stream for agricultural, industrial, or other consumptive uses." *Adair*, 723 F.2d at 1411. Instead, "the entitlement consists of the right to prevent other appropriators from depleting the streams below a protected level in any area where the non-consumptive right applies." *Id*; *see also Baley v. United States*, 942 F.3d 1312, 1322 (Fed. Cir. 2019) (characterizing the Klamath Tribes' water rights, as determined in *Adair*, in similar terms).[5]

---

[5] Thus, despite the plaintiffs' NEPA claim here, enforcement of the Tribes' water rights actually serves an environmental purpose, since those rights entitle the Tribes to maintain water levels necessary to prevent the extinction of certain fish the Tribes traditionally hunted. *See Baley*, 942 F.3d at 1328–29 (explaining, as the Court of Federal Claims found, that the Klamath Tribes have an "aboriginal right to take fish [that] entitles them to prevent junior appropriators from withdrawing water from Upper Klamath Lake and its tributaries in amounts that would cause the extinction of the Lost River and short nose suckers." (internal quotations omitted)); *see also* Defs.' Reply

The priority date of the Tribes' water rights—meaning the date at which the rights were perfected—is "time immemorial." *Adair*, 723 F.2d at 1414. That is because, as the Ninth Circuit held in *Adair*, "[t]he rights were not created by the 1864 Treaty, rather, the treaty confirmed the continued existence of these rights." *Id*; *see also Baley*, 942 F.3d at 1328, 1341 (affirming the Court of Federal Claims' conclusion that the Klamath Tribes' water right carries a "time immemorial" priority date).

As a result, as the plaintiffs concede, the Tribes' water rights are senior to and take priority over the subsequently established water rights of the plaintiffs. *See* Am. Compl. ¶ 15. In Oregon, as in most Western states, state-law water rights are determined according to the doctrine of prior appropriation. *Adair*, 723 F.2d at 1410. Prior appropriation is essentially a first-in-time rule. Under this doctrine, "the one who first appropriates water and puts it to beneficial use thereby acquires a vested right to continue to divert and use that quantity of water against all claimants junior to him in point of time." *Arizona*, 373 U.S. at 555. In *Adair*, the Ninth Circuit held that the "Klamath Tribe is entitled to a reservation of water, with a priority date of immemorial use, sufficient to support exercise of treaty hunting and fishing rights." *Adair*, 723 F.2d at 1415. Applying this federally protected right as against the state-law rights of neighboring junior appropriators, the Klamath Basin Adjudication then quantified the specified water levels to which the Tribes were entitled. *See* Am. Compl. ¶ 20 (describing the conclusions of the ACFFOD).

Thus, the Klamath Tribes have a legally enforceable federal right to maintain streamflow levels as quantified in the ACFFOD. That right, as is the case with all reserved tribal rights, belongs to the tribes. *Shoshone Bannock Tribes*, 56 F.3d at 1479 ("With respect to reserved

---

at 17, n.8 (noting that "enforcement of the Tribes' water rights is important to efforts to avoid adverse impacts to the health of the treaty-protected fishery.").

water rights on Indian reservations, these federally-created rights belong to the Indians rather than to the United States."); *see also* Cohen's Handbook at 1238 ("Reserved rights to water are property rights held by tribes and their members.").  The United States holds legal title "only as trustee." *Shoshone Bannock Tribes*, 56 F.3d at 1479.  Consistent with the United States' trust obligation to protect Indian treaty rights, the government can bring suit to enforce those rights, but the rights themselves clearly "belong to the Tribes." *United States v. Washington*, 853 F.3d 946, 967 (9th Cir. 2017), *aff'd by an equally divided court*, 138 S. Ct. 735 (2018).

### 2.    *Plaintiffs' Focus on the Protocol Agreements is Misplaced*

Set against these clearly established legal principles surrounding federally protected tribal water rights, the plaintiffs cannot establish causation or redressability.  First, with regard to causation, the plaintiffs' injuries are not "fairly traceable" to the Protocol Agreements.  *Lujan*, 504 U.S. at 560 (internal quotation marks omitted).  Nor is it "substantially probable" that the procedural breaches alleged by the plaintiffs have caused or will cause "the essential injury to the plaintiff's own interest." *Fla. Audubon Soc.*, 94 F.3d at 665.  The Protocol Agreements are not the source of the Tribes' authority to enforce their water rights against those of junior appropriators, including plaintiffs.  That authority is clearly established in federal law and stems from the 1864 Treaty.  With a priority date of "time immemorial," as held in *Adair*, the Tribes' federal water right is senior to plaintiffs' water rights.

Meanwhile, the plaintiffs do not allege that the Protocol Agreements amplified or otherwise distorted the Tribes' federally protected rights to the detriment of the plaintiffs.  The calls for enforcement made between 2013 and 2018 by the Tribes and the BIA were calls to enforce to the levels quantified by the ACFFOD or to lesser agreed-upon levels.  *See* Am. Compl. ¶¶ 25, 29, 32.  In other words, the complained of calls, implemented in accordance with

the Protocol Agreements, did nothing to increase the Tribes' water rights entitlement. In 2013, 2017, and 2018, the calls simply sought to protect the Tribes' non-consumptive right as quantified by the ACFFOD. *See id.* ¶¶ 25, 32. Between 2014 and 2016, the Tribes sought less water, in accord with the now defunct UKBCA settlement agreement reached between the Tribes and the plaintiffs. *See id.* ¶¶ 28–29. Thus, the ultimate cause of plaintiff's essential injuries— the waterflow reductions and shut-offs instituted by OWRD—is the Klamath Tribes' federally protected, senior water right, not the Protocol Agreements. The Protocol Agreements simply establish a consultation procedure, as well as points of contact to facilitate communication with OWRD when necessary.

Second, the plaintiffs have also failed to demonstrate redressability. When, as here, the complained of harm depends on the behavior of a third party not before the Court, the plaintiffs must allege facts "sufficient to demonstrate a substantial likelihood that the third party directly injuring the plaintiff would cease doing so as a result of the relief the plaintiff sought." *Renal Physicians Ass'n*, 489 F.3d at 1275; *see also Klamath Water Users Ass'n*, 534 F.3d at 739. The plaintiffs argue that invalidating the Protocol Agreements would redress their ultimate injuries. *See* Pl.'s Opp'n at 13–15. Yet, even if the Protocol Agreements were invalidated, plaintiffs provide no reason to believe the Klamath Tribes would cease to seek enforcement of their water rights. As discussed, these rights, held in trust by the United States, belong to the Tribes. *See Shoshone Bannock Tribes*, 56 F.3d at 1479; *United States v. Washington*, 853 F.3d at 967. With or without the Protocol Agreements, the Tribes thus remain entitled to seek enforcement of their water rights at the levels quantified by the ACFFOD.

The redressability problem plaintiffs face is analogous to that in *St. John's United Church of Christ v. F.A.A.*, 520 F.3d 460 (D.C. Cir. 2008), a case that also involved harm caused by a

third-party. There, the D.C. Circuit held that the plaintiffs lacked standing to challenge the procedure by which the Federal Aviation Administration ("FAA") approved grant funding for an airport extension project carried out by the city of Chicago. The plaintiffs alleged procedural injury, arguing that the FAA violated the Religious Freedom Restoration Act in approving the grant money. Nonetheless, the Circuit found no redressability since the plaintiffs failed to show a "substantial probability" that the city—the third-party source of plaintiff's complained of harm—would have abandoned the airport extension without the FAA's grant funds. *St. John's United Church*, 520 F.3d at 463. The "redressability obstacle the petitioners face," the Circuit explained, "is uncertainty over what Chicago would do—not the FAA." *Id.*

Likewise, in *Klamath Water Users Association*, the D.C. Circuit found no redressability when a plaintiff failed to show that third-party regulatory decisions responsible for alleged harm were likely to change as a result of a favorable decision. In that case, the Klamath Water Users Association sought relief against the Federal Energy Regulatory Commission ("FERC"), which had decided not to renew a contract provision setting low electricity rates for Klamath Basin irrigators in Oregon and California in FERC's lease agreement with PacifiCorp, a power company, for the Link River Dam. 534 F.3d at 736–38. Separately, the Oregon Public Utility Commission and California Public Utilities Commission, which had "independent authority to fix the rates charged … to [their] retail customers," *id*. at 736, decided to charge irrigators in the Klamath Basin "full tariff rates" rather than the lower rates established in FERC's prior contract, *Id*. at 738. The Circuit held that the water association "failed to demonstrate redressability," *id*. at 739, because it "offered no reason to believe that a decision requiring FERC to include the 1956 contract in PacifiCorp's annual licenses would have such an effect on the retail rate decisions of California and Oregon," *id*. at 740. The court further explained that, when "relief

for the petitioner depends on actions by a third party not before the court, the petitioner must demonstrate that a favorable decision would create 'a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered.'" *Id*. at 739 (quoting *Utah v. Evans*, 536 U.S. 452, 464 (2002)). That was not the case in *Klamath Water Users*, since the ultimate harm—increased power costs—was unlikely to be redressed by a favorable decision as to FERC, given Oregon and California's independent rate-setting authority.[6]

In yet another closely analogous case, *Ashley v. U.S. Dep't of the Interior*, 408 F.3d 997 (8th Cir. 2005), the Eighth Circuit applied this same principle concerning the lack of redressability when dependent on a third party's choices. There, the Sioux tribe issued bonds and, with government approval, assigned certain funds received from a federal development grant to the purchaser of the bonds. *Id*. at 999. The plaintiffs challenged the government's approval, arguing—as plaintiffs do here, Am. Compl. ¶¶ 44, 46—that the government's action was *ultra vires*. Finding that no order in the case "would be likely to remedy the injuries complained of" since "the Tribe is not a defendant and none of the defendants controls the Tribe's challenged behaviors," *id.* at 999–1000, the case was dismissed for lack of standing, *id.* at 999. The court reasoned that undoing the government's approval of the bond issuance would do nothing "to prevent the Tribe from spending trust money on a new bond deal of the same

---

[6] The D.C. Circuit recently found that plaintiffs had sufficiently met the redressability requirement for standing when their alleged harm was due, in part, to the decision of a third party not before the court. *See Woodhull Freedom Foundation v. United States*, No. 18-5298, 2020 WL 398625, (D.C. Cir. Jan. 24, 2020). *Woodhull* confirmed the long-standing redressability standard that "[w]here the requested relief for the [plaintiff] depends on actions by a third party not before the court, the plaintiff must demonstrate that a favorable decision would create a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Id.* at *6 (internal quotation marks omitted) (citing *Klamath Water Users Ass'n*, 534 F.3d at 739)). Applying this standard, the Court found that the third party in the case—Craigslist—*would* act differently if the challenged statute, the Allow States and Victims to Fight Online Sex Trafficking Act ("FOSTA"), were struck down, citing evidence that Craigslist had removed the plaintiff's massage listings, which caused the complained of harm, to avoid anticipated liability under FOSTA, and had clearly expressed "its desire" to restore such listings if legally feasible in the future. *See id*. at *6. *Woodhull* is thus distinguishable from this litigation, where plaintiffs, as explained above, have failed to demonstrate that the Klamath Tribes are likely to abandon enforcement of their senior water rights absent the challenged Protocol Agreements.

sort." *Id.* at 1000. "The underlying difficulty for the plaintiffs," as in *St. John's United Church*, was that "they 'seek to change the defendant's [*i.e.*, the government's] behavior *only* as a means to alter the conduct of a third party [the Tribe], not before the court, who is the direct source of the plaintiff['s] injury.'" *Id.* at 1003 (alterations in original) (quoting *Common Cause v. Dep't of Energy*, 702 F.2d 245, 251 (D.C. Cir. 1983)).

Here, as in *St. John's United Church*, *Klamath Water Users Association*, and *Ashley*, the plaintiffs challenge government action in order to remedy harm ultimately caused by enforcement of a third-party's senior water rights. Yet the third party, the Klamath Tribes, are entitled to enforce their senior water rights, as established in *Adair* and quantified by the ACFFOD, regardless of whether the Protocol Agreements stand. In these circumstances, the plaintiffs have not shown, as they must, that the Tribes are likely to abandon enforcement if the remedy plaintiffs seek—rescission of the challenged Protocol Agreements, *see* Am. Compl., Prayer for Relief—is granted.

Accordingly, this case must be dismissed due to the plaintiffs' lack of standing.

### B.     The Plaintiffs' State-Law Arguments Are Unavailing

In a last-gasp effort to proceed with this lawsuit, the plaintiffs argue that another Federal law, plus Oregon state law and a state administrative decision, would prevent the Tribes from enforcing their rights independently. *See* Pl.'s Opp'n at 8–12. These arguments are incorrect. Plaintiffs rely first on the McCarran Amendment, 43 U.S.C. § 666, a federal statute enacted in 1952 that waives federal sovereign immunity to allow for "the joinder of the federal government in state suits for the general adjudication of all water rights in river systems and for the administration of the adjudicated rights." Cohen's Handbook at 1242; *see also Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 802–03 (1976). While the McCarran Amendment's sovereign immunity waiver applies to Indian water rights held in trust by the

federal government, *see Colo. River Water*, 424 U.S. at 809–12, the Supreme Court has made clear this law "in no way changes the substantive law by which Indian rights in state water adjudications must be judged," *Arizona v. San Carlos Apache Tribe*, 463 U.S. 545, 571 (1983); *see also Colo. River Water*, 424 U.S. at 813 ("The Amendment in no way abridges any substantive claim on behalf of Indians under the doctrine of reserved rights."). The fact that the Klamath Tribes' reserved rights were quantified in state proceedings, and are physically enforced by the state's water department, does nothing to alter the substantive rights themselves. That is to say, the McCarran Amendment does not—as plaintiffs seem to suggest, *see* Pl.'s Opp'n at 11–13—compromise, revise, or otherwise diminish the Klamath Tribes' water rights.

Plaintiffs rely on two Oregon supreme court cases to bolster their position, but neither case supports the proposition that the Klamath Tribes lack the ability to enforce their water rights absent the Protocol Agreements. In *Fort Vannoy Irr. Dist. v. Water Resources Com'n*, 188 P.3d 277 (Or. 2008), the Oregon Supreme Court interpreted a state statute, ORS 540.510(1), governing the diversion or transfer of certificated water use, as part of the determination whether a private water user could make such a transfer without the consent of the irrigation district of which he was a member. The state statute at issue and the broader question addressed by the court—"whether the ownership of water rights resides with a water organization or its members," *see id*. at 286—play no role in the outcome of this case. *Fort Vannoy* says nothing about Indian law and tribal water rights, for which the substantive basis is *federal* law, not state law. The Klamath Tribes' rights important to this case derive from the Klamath Treaty, not the doctrine of prior appropriation or, as was dispositive in *Fort Vannoy*, "the intent of [the Oregon] legislature as expressed in the Water Rights Act and the Irrigation District Law." *Id*. at 286–87.

The plaintiffs' reliance on *Klamath Irr. Dist. v. United States*, 227 P.3d 1145 (Or. 2010) (en banc), *see* Pls.' Opp'n at 11, is similarly misplaced because it deals solely with questions of state law, not with federal reserved rights. In *Klamath Irrigation District*, the Oregon Supreme Court addressed three questions certified by the Federal Circuit, the second of which was "whether beneficial use alone is sufficient to acquire a beneficial or equitable property interest in a water right to which another person holds legal title." *Id.* at 1160. The state court's subsequent analysis about how to establish a beneficial use right through *appropriation* is not relevant here, since the Klamath Tribes' rights are established by treaty, not by appropriation. Indeed, after the certified state-law questions had been answered, the Court of Federal Claims and the Federal Circuit held that the water rights of the private landowner appellants in the case "were subordinate to the Tribes' federal reserved water rights," *Baley*, 942 F.3d at 1341, and that the "the superior water rights of the Tribes required that the Bureau [of Reclamation] temporarily halt deliveries of water to [private landowner] appellants," *id.* at 1331.

Finally, the plaintiffs argue that OWRD "expressly rejected the Tribes' attempt to secure legal title in their own name to a water right," Pl.'s Opp'n at 8, by pointing to a 2014 order of determination issued as part of the Klamath Basin Adjudication, *see* Amended Mot. Requesting Judicial Notice, Ex. 4, Corrected Partial Order of Determination ("Corrected Partial Order") (Feb. 28, 2014), ECF No. 21-6. The order of determination, however, simply does not do what the plaintiffs say it does. During the adjudication, the United States filed multiple claims concerning the "hunting, trapping, fishing and gathering purposes of the Klamath Treaty of 1864" on behalf of the tribes. *See* Corrected Partial Order at 12. The Tribes then filed an additional claim "incorporate[ing] the United States' claims in this case by reference." *Id.* ORWD dismissed this additional claim, which simply restated by reference the claims already

filed, as "duplicative of the United States' claims," *id*., not because the Tribes lacked authority to seek enforcement of their rights. In other words, the order did not "expressly reject[] the Tribes' attempt to secure legal title in their own name to a water right," Pl.'s Opp'n at 8, but merely disregarded a set of duplicative claims. Plaintiffs' state-law arguments are thus entirely unavailing.

The plaintiffs have fallen far short of demonstrating that the harms they allege are caused by the challenged Protocol Agreements or would be redressed by rescission of those agreements, since the relief they seek, including "prohibiting defendants from issuing any more calls," Am. Compl., Prayer for Relief, ¶ 4, would not stop enforcement of the water rights held by the Klamath Tribes, a third party not before the Court. For either of these shortcomings, the plaintiffs lack standing.

## IV. CONCLUSION

For the foregoing reasons, the defendants' Motion to Dismiss, ECF No. 17, is granted because the plaintiffs lack standing. An accompanying Order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: January 31, 2020

_____
BERYL A. HOWELL
Chief Judge